**Opinion issued October 15, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00388-CV

————————————

## IN THE INTEREST OF M.A.B., IV, A CHILD

---

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2014-00044J

---

## MEMORANDUM OPINION

In this accelerated appeal, appellant M.A.B., Jr. ("M.A.B.") challenges the trial court's decree terminating his parental rights to his minor child, M.A.B., IV. In seven issues, M.A.B. argues that (1) the decree was not a final judgment; (2) the evidence was legally and factually insufficient to support the termination of his rights under Texas Family Code sections 161.001(1)(N), (O), or (Q); (3) the

evidence was legally and factually insufficient to support the finding that termination of M.A.B.'s rights was in the best interest of the child under Texas Family Code section 161.001(2); (4) the decree should be reversed because his trial counsel was ineffective; and (5) the trial court's findings of fact and conclusions of law entered at the abatement hearing on M.A.B.'s ineffective assistance claim are unsupported. We affirm.

## Background

### *Removal and pre-trial proceedings*

Both M.A.B. and the child's mother were incarcerated when the child was born in November 2013. M.A.B. was serving a three-year sentence for felony cocaine possession and evading arrest. The child was released to the care of his paternal grandmother, Phylecia Holiday. A week after the child was born, Holiday took him to the Women, Infants, and Children Program (WIC) Office. While there, the child twice fell out of his car seat and concerned WIC staff contacted the Department of Family and Protective Services. The Department initiated an investigation and learned that Holiday had a criminal history and history with the Department involving allegations of neglect and drug use. During the investigation, the Department asked Holiday to submit to a drug test, but she refused and later admitted that she would test positive for marijuana and prescription drugs. A review of the Department's records also revealed that two

years before, it had conducted an investigation regarding a malnourished two-year-old stepchild of M.A.B. and had concluded that there was reason to believe that domestic violence, drug use, and the selling of drugs was occurring in the home.

In January 2014, the Department sought emergency removal of the child and termination of the parents' rights, naming his parents and Holiday as respondents. The trial court granted the emergency removal request and appointed the Department sole temporary managing conservator of the child until a full adversarial hearing could be held. The trial court appointed lawyers for each of the parents, who appeared at the subsequent hearing on behalf of their clients; Holiday appeared on her own behalf. After the hearing, the trial court continued the Department's appointment as temporary managing conservator and ordered the parents and Holiday to comply with the Department's family service plans as a condition of reunification.

In February 2014, the Department's family service plans for the parents and Holiday were filed. Among other things, M.A.B.'s plan required him to provide the Department with "a list of people that he would like the child to possibly live with." It also required him to "enroll and finish the Changing Habits and Achieving New Goals to Empower Success (CHANGES) reintegration program provided by the TDCJ state prison system" and to provide proof of completion to

3

the Department. The Department sent a copy of the family service plan to M.A.B. and he returned a signed copy of the signature page.

In March 2014, a status hearing was conducted at which the family service plans were incorporated into the court's order. In June 2014, the trial court held a permanency hearing that was continued to July 2014. Holiday did not appear at these two hearings and the trial court therefore entered an order that she "did not appear and wholly made default." A third permanency hearing was held in September 2014. M.A.B.'s trial counsel appeared at each of these hearings on his behalf.

Trial was set for December 9, 2014. However, M.A.B.'s trial counsel requested a continuance so that M.A.B. could participate in the trial because she had "overlooked bench warranting him." The trial court permitted trial to commence. After the Department's caseworker briefly testified that the Department's goal in the case was unrelated adoption and that the child was currently in a foster home (testimony which spanned less than one page of the reporter's record), the Department agreed to the continuance request and trial was recessed until February 3, 2015.

### Trial and related proceedings

The child's mother did not appear for trial. At trial, the Department's caseworker Sharlina Boyd testified that M.A.B. was incarcerated when the child

4

was born and would not be released until 2016. Boyd testified that M.A.B. signed and returned the signature page on his family service plan, but did not complete the CHANGES program or contact the Department to provide any of the information required by the plan. Boyd testified that, other than returning the signature page, M.A.B. had no contact with the Department.

Boyd contacted other relatives in an effort to find a placement for the child. At least six possible placements suggested by family members were considered and ruled out for various reasons. In addition to these suggested placements, the Department also considered placing the child with his paternal grandfather, M.A.B., Sr., but M.A.B., Sr. tested positive for marijuana and did not complete services that could have made him eligible for placement. Finally, the Department conducted a home study of Jacklyn Ross, the child's great-great-aunt, and approved the study. However, Boyd testified that Child Advocates and the child's ad litem attorney objected to placement with Ross.

Terri Morgan, a representative for Child Advocates, testified that Child Advocates had concerns regarding the safety and stability of the possible placement with Ross. Specifically, Morgan testified that Ross and her husband were separated and the cause of the separation was Ross's son, who regularly came to the house, broke things, and did not fix them. She testified that her concern regarding the separation was that Ross "can cover the bills but that's it" and that

Ross's husband was giving her $800 per month "to help with the stability of the home but it is not Court ordered." On cross-examination by M.A.B.'s lawyer, Morgan admitted that Ross has stable employment, that her home was appropriate for the child, and that Ross's son does not live in the home. Morgan also admitted that although the child had bonded with his foster mother, given the opportunity, he could also bond with Ross.

M.A.B.'s trial counsel called Ross, who testified that she came forward to volunteer for placement "at the wishes of the parents." She testified that she has two master's degrees and had just recently resigned her position as a professor after 14 years. She testified that her husband had not moved out, but instead that they owned two homes, one a rental property, and her husband had moved into the rental property to repair it. She testified that she and her husband would raise the baby and she intended to adopt him.

M.A.B.'s trial counsel also called him to the stand, and he testified that he was asking the court to place his child with Ross because she was part of his family. He also asked the court not to terminate his parental rights. He testified that he had started taking CHANGES classes, but had not completed the program because he was "currently in a secure facility that makes it difficult."

M.A.B.'s trial counsel also called Brenda Brooks, the child's great-grandmother. Brooks had been considered as a placement by the Department, but

ruled out because she had Department history. M.A.B.'s trial counsel adduced testimony from Brooks that her Department history was 39 years old, that the child had been returned to her and was a successful member of the community, and that she was not at fault for the removal. Brooks asked to be considered as a placement.

The foster mother testified that she had been the caregiver for the child for over a year and that he was "doing exceptionally well" and had "no issues." She testified that she would "definitely" adopt him.

The Department, the mother, M.A.B., and the child's ad litem attorney presented closing arguments. The trial court then requested additional testimony from Morgan. In response to the trial court's question regarding why she was recommending termination, Morgan testified that neither parent had put forth sufficient effort to complete services under the family service plans. The trial court asked several questions regarding why non-family placement with the foster mother was being recommended over placement with a family member. Morgan testified that there were conflicting stories about Ross's income, that Ross had come forward late in the process, and that Morgan had some concern that Ross volunteered based upon family pressure. The trial court requested Ross's home study to consider whether the child would stay in his current placement or be placed with Ross.

On March 17, 2015, the parties returned to court for an additional hearing related to whether the child would continue in his foster placement or be placed with Ross.[1] M.A.B.'s trial counsel appeared on his behalf. The Department presented additional evidence related to the child's placement. Specifically, Boyd testified that the child's mother told her that she had been threatened by M.A.B.'s family, which is why she was in hiding and had not appeared for trial. The mother told Boyd that M.A.B. had physically abused her in the past while she was pregnant with another child and caused a miscarriage and that while Ross was a decent person, the mother believed that Ross would eventually give the child back to M.A.B. The mother told Boyd that she did not want him to be raised in an environment where physical abuse of women was accepted and that she believed it was in the child's best interest to remain with his foster mother. At the conclusion of the hearing, the trial court determined that the child would continue in his foster placement and named the Department sole managing conservator.

The trial court entered a written order which found the following grounds for termination of M.A.B.'s parental rights:

> [M.A.B.] constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than six months and: (1) the Department . . . has made

---

[1] In a subsequent abatement hearing, the trial court stated that, it had determined that both parents' rights should be terminated before the March 2014 hearing, and the only purpose of the March hearing was to decide whether the child should continue in his foster placement or be placed with Ross.

reasonable efforts to return the child to [him]; (2) the father has not regularly visited or maintained significant contact with the child; and (3) the father has demonstrated an inability to provide the child with a safe environment, pursuant to § 161.001(1)(N), Texas Family Code;

[M.A.B.] failed to comply with the provisions of a court order that specifically established the actions necessary for [him] to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to § 161.001(1)(O), Texas Family Code;

[M.A.B.] knowingly engaged in criminal conduct that has resulted in [his] conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition, pursuant to § 161.001(1)(Q), Texas Family Code[.]

The trial court also found the Department had proved by clear and convincing evidence that termination of M.A.B.'s parental rights was in the child's best interest.

*Appeal and abatement hearing regarding ineffective assistance claim*

M.A.B. appealed. After the appeal was filed, we abated this appeal at M.A.B.'s request to permit the trial court to hold a hearing on M.A.B.'s claim that his trial counsel was ineffective. Among other things, M.A.B. claimed that he did not know he had an appointed lawyer until he appeared for trial because his lawyer never spoke with him before trial. At the hearing, the trial court heard the testimony of M.A.B.'s trial counsel, Brooks, Ross, M.A.B., Sr., and M.A.B. The trial court found, among other things, that M.A.B. had not met his burden under

9

*Strickland's* second prong to show that there was a reasonable probability that the result of the proceeding would have been different but for trial counsel's allegedly unprofessional errors.

## Jurisdiction

In his seventh issue, M.A.B. argues that the decree may be interlocutory because it does not dispose of a purported pro se intervention for visitation and possession filed by Holiday. We consider this threshold issue before addressing the merits of M.A.B.'s appeal.

## A. Standard of Review and Applicable Law

We consider de novo the legal question of whether we have jurisdiction over an appeal. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). Generally, appellate courts have jurisdiction only over appeals from final judgments, unless the appeal is authorized by statute. *See Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001).

"Because the law does not require that a final judgment be in any particular form, whether a judicial decree is a final judgment must be determined from its language and the record in the case." *Id.* A judgment is final if it disposes of all pending parties and claims, but "a trial court's judgment need not expressly dispose of all issues and claims in order to be final." *Vaughn v. Drennon*, 324 S.W.3d 560, 562 (Tex. 2010); *see Lehmann*, 39 S.W.3d at 195. "If there is any

10

doubt as to the judgment's finality, then finality must be resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties." *Vaughn*, 324 S.W.3d at 563 (internal citation and quotation marks omitted). A judgment rendered following trial on the merits is presumed to be final. *Id.* at 562 ("We have long recognized a presumption of finality for judgments that follow a conventional trial on the merits.").

## B. Analysis

M.A.B. contends that we may lack jurisdiction over the appeal because Holiday filed a pro se intervention in May 2014 and the final judgment does not expressly address the relief requested therein. In May 2014, Holiday filed several documents, including one entitled, "Affidavit of Inability to Pay Costs." A second handwritten document was entitled, "Grandparent Visitation Rights." That document stated that there were different types of grandparent access statutes and stated: "I hope you consider whether the proposed child visitation arrangement is in the best interest of the child," and "I want to get visit right to see him why he's in CPS custody please. I have not seen him but one time since he been with CPS please help me[.] I would like to visit him every week please." Accompanying that document was a form standard possession order for co-parents with Holiday's name filled in in place of a parent's name and the handwritten statement, "I want

11

all of this!" across the top. M.A.B. characterizes these documents as a pro se intervention. The Department argues that these documents are not properly characterized as a pro se intervention.

Assuming without deciding that Holiday's filing constitutes an affirmative claim for relief, *see* TEX. FAM. CODE ANN. § 153.432 (West 2014) ("Suit for Possession or Access by Grandparent"), we conclude that the judgment disposed of it by denying relief after a conventional trial on the merits, and that the decree is a final judgment incorporating that decision. Because the decree was rendered after a trial on the merits, we must presume that the decree is final. *See Vaughn* 324 S.W.3d at 562.

The language of the decree supports the presumption of finality. The decree states that "[e]xcept as otherwise provided in this order . . . any parties claiming a court-ordered relationship with the child are **DISMISSED** from this suit." This encompasses Holiday's requests for visitation and possession. The decree also contains a "Mother Hubbard" clause stating that "all relief requested in this case and not expressly granted is denied." Finally, under the heading "Appeal of Final Order," the decree states that "a party affected by this order has the right to appeal." Thus, the language of the decree supports the presumption of finality. *See Vaughn*, 324 S.W.3d at 563 (if any doubt regarding judgment's finality,

language of decree should be considered to determine trial court's intent); *Lehman*, 39 S.W.3d at 203 (same).

The record as a whole also supports the presumption of finality. *See Vaughn*, 324 S.W.3d at 563 (if any doubt regarding judgment's finality, record as a whole should be considered to determine trial court's intent); *Lehman*, 39 S.W.3d at 203 (same). The child required emergency removal after just a few days in Holiday's care and Holiday was named as a respondent in the termination proceeding. She filed her documents May 2, 2014, while she was still a respondent to the suit. Holiday later failed to appear at two permanency hearings, and the trial court entered an order stating that Holiday "although duly and properly notified, did not appear and wholly made default." The evidence at trial showed that Holiday did not cooperate with the Department and admitted that she would test positive for marijuana and prescription drugs, and the trial court approved placement of the child with someone other than Holiday. Nothing in the record rebuts the presumption of finality. Thus, the record as a whole supports the presumption of finality.

In sum, the decree, entered after trial on the merits, is presumptively final, and nothing in the record rebuts that presumption. Accordingly, we hold that the decree is final and that we have jurisdiction over this appeal. *See Lehman*, 39

S.W.3d at 195 (appellate courts have jurisdiction over appeals from final judgments).

We overrule M.A.B.'s seventh issue.

## Sufficiency of the Evidence

In his third, fourth, fifth, and sixth issues, M.A.B. contends that the evidence supporting the trial court's termination of his parental rights is legally and factually insufficient.

### A. Standard of Review

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In a legal sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In a factual sufficiency review, the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a reasonable factfinder could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* We should consider whether disputed evidence is such that a reasonable factfinder could not

have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B.    Termination under section 161.001(1)(O)

In his fourth issue, M.A.B. argues that the evidence is legally and factually insufficient to support termination of his parental rights under section 161.001(1)(O).  Under subsection O, a parent's rights may be terminated when the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(1)(O).

M.A.B. does not dispute that the child has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of removal under Chapter 262 for abuse or neglect.  And M.A.B acknowledges on appeal that he "had a relatively simple and straightforward Family Service Plan," and that "[t]here was only one direct requirement placed upon [him] to be completed while he was in custody"—completion of the

16

CHANGES program. At trial, M.A.B. conceded that he had not completed the CHANGES program. He testified that he had started the program, but that he was currently in a secure facility that made it "difficult" to complete. M.A.B. acknowledges that substantial compliance with a court-ordered family service plan is insufficient to avoid termination, and challenges termination under subsection O on only one basis—that his failure to complete the CHANGES program or to negotiate a family service plan that did not include the requirement to complete the CHANGES program was due to ineffective assistance by his trial counsel. *See In re T.T.*, 228 S.W.3d 312, 319–20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with provisions of court orders inadequate to avoid termination findings under subsection O). Essentially, M.A.B. argues that his failure to complete the CHANGES program as ordered should be excused by trial counsel's alleged ineffectiveness.[2]

However, "any excuse for failing to complete a family services plan goes only to the best interest determination," and not to whether sufficient evidence supports a predicate finding under subsection O. *See In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("any excuse for failing to complete a family services plan goes only to the best interest

_____

[2] We consider the merits of M.A.B.'s ineffective assistance claim separately below.

17

determination," not to predicate finding); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied) (rejecting argument that parental excuse for noncompliance with family service plan may preclude finding under section 161.001(1)(O)); *see also Holley v. Adams*, 544 S.W.2d 367, 371 (Tex. 1976) (parent's excuse for failing to adequately support child "can be considered by the trial court *only* as one of the factors in determining the best interest of the child," and not in determining whether parent failed to support child) (emphasis added). The evidence conclusively established that M.A.B. did not complete the requirements of his court-ordered family service plan. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's finding under subsection O. *See, e.g.*, *In re M.C.G.*, 329 S.W.3d at 675 (appellant's failure to complete one requirement in family service plan supported predicate finding for termination); *see also In re T.T.*, 228 S.W.3d at 319 (evidence that appellants substantially complied with family service plan was insufficient to avoid termination finding under section 161.001(1)(O) because they did not comply with all requirements).

We overrule M.A.B.'s fourth issue. Because sufficient evidence of only one predicate finding is necessary to support termination, we need not address M.A.B.'s third and fifth issues challenging the predicate findings for termination under subsections 161.001(1)(N) and (Q).

## C.    Best Interest of the Child

In his sixth issue, M.A.B. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the child's best interest.

### 1.    Applicable Law

A strong presumption exists that a child's best interest is served by maintaining the parent-child relationship. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), the Texas Supreme Court provided a nonexclusive list of factors that the factfinder in a termination case may use in determining the best interest of the child. *Id.* at 371–72. These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and the Department need not prove all factors as a condition precedent to parental

termination. *In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2014). Evidence establishing one of the predicate acts under section 161.001(1) also may be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28.

### 2. Analysis

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of M.A.B.'s parental rights was in the child's best interest.

Reviewing the *Holley* factors, we first consider evidence of the child's desires. The child was less than two years old when the termination decree was entered, and M.A.B. and the Department agree that he did not testify about his desires.

Under the second and fourth *Holley* factors, we consider the evidence of the child's present and future emotional and physical needs, and the evidence regarding the abilities of those seeking custody to parent and provide for his needs. The Department's caseworker testified that the child was doing well with his foster

mother, was healthy and had no developmental issues or special medical needs. She testified that he was bonded with his foster mother and that his needs were being met in the placement. M.A.B. concedes with respect to his ability to parent that he was incarcerated from the time that his son was born and would not be released until March 2016. He argues, however, that the evidence shows that Ross could have provided for the child's needs because she was an approved relative, the Department's policy is to place a child with relatives, and Ross testified that she volunteered to care for the child at the wishes of the parents.

With respect to the third *Holley* factor, evidence of the emotional and physical danger to the child now and in the future, the evidence showed that since 2005, M.A.B. has been convicted three times of possession with intent to deliver cocaine, convicted once each of evading arrest and criminal mischief, and charged with a number of other crimes. M.A.B. argues that although he has a history of repeated criminal behavior and drug offenses, he committed those crimes before knowing that the child's mother was pregnant with the child. But a parent's past criminal conduct may be considered when determining whether a child will be exposed to emotional or physical danger in the future. *See In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (observing that incarcerated parent's absence from child's daily life, inability to support child, and parent's commission of criminal acts subjecting him to possibility of incarceration

21

can negatively impact child's emotional well-being and are factors supporting termination); *see, e.g.*, *In re C.A.Y.*, No. 04-05-00302-CV, 2006 WL 228714, at *4 (Tex. App.—San Antonio Feb. 1, 2006, pet. denied) (mem. op.) (incarcerated parent's past criminal conduct was evidence demonstrating child would be exposed to emotional and physical danger if parent were to care for child); *see also Castorena v. Tex. Dep't of Protective and Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *11 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.) (trial court is not bound to accept truth of parent's testimony as to past actions or future intentions). The evidence also showed that a past Department investigation of M.A.B.'s malnourished stepchild had determined that there was reason to believe that domestic violence, drug use, and the selling of drugs was occurring in the home. Evidence of past parental misconduct or neglect can be used to measure a parent's future conduct. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied).

There is no evidence in the record regarding the fifth *Holley* factor, programs available to assist the individuals seeking custody in promoting the best interest of the child.

Concerning *Holley* factors six and seven, in which we examine the plans for the child by the individual and by the agency seeking custody and the stability of

the home or proposed placement, the record reflects that the child has been thriving in his placement with his foster mother and that she intends to adopt him. M.A.B. was incarcerated and the evidence showed that prior to incarceration, the Department had concluded that there was reason to believe that there was domestic violence, drug use, and the selling of drugs occurring in his home.

With regard to the eighth and ninth *Holley* factors, evidence of acts or omissions that indicate that the existing parent-child relationship is not a proper one and any excuse for the acts or omissions, the evidence shows that M.A.B. has never met his child because he was born while M.A.B. was incarcerated, and that M.A.B. would be incarcerated for the first few years of his child's life. With respect to excuses for any act or omission, M.A.B. testified at the termination hearing that, although his family service plan required him to complete only one program as a condition of reunification—the CHANGES program—it was difficult for him to complete that program in a secure unit. He argues that but for trial counsel's ineffective assistance, he would have demonstrated that it was impossible for him to complete the program and obtained a modification with different requirements.

After considering the entire record, including the fact that M.A.B. was incarcerated for the first few years of his child's life because of his criminal activity, M.A.B.'s history of criminal activity, the Department's conclusions in a

previous investigation involving M.A.B., and the evidence regarding the child's foster placement, we conclude that a reasonable factfinder considering all the evidence could have formed a firm belief or conviction that termination of M.A.B.'s parental rights was in the child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 28. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of M.A.B.'s parental rights was in the child's best interest.

We overrule M.A.B.'s sixth issue.

### Ineffective Assistance

In his first issue, M.A.B. contends that the decree should be reversed because his trial counsel was ineffective and in his sixth issue, he contends that the trial court's findings of fact and conclusions of law entered after the abatement hearing on his ineffective assistance claim are unsupported.

### A. Standard of Review and Applicable Law

"In Texas, there is a statutory right to counsel for indigent persons in parental-rights termination cases." *P.W. v. Dep't of Fam. & Protective Servs.*, 403 S.W.3d 471, 475 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.) (first quoting *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003); and then citing TEX. FAM. CODE ANN. § 107.013(a)(1) (West 2014)). "The supreme court has held this right to counsel 'embodies the right to effective counsel.'" *Id.* (quoting *In re M.S.*, 115

S.W.3d at 544). "To evaluate claims of ineffective assistance in parental-rights termination cases, the supreme court adopted the ineffective assistance standard applied in criminal cases, the test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)." *Id.* (citing *In re M.S.*, 115 S.W.3d at 545). "To show ineffective assistance of counsel under *Strickland*, the defendant has the burden to show both that counsel's performance was deficient and that counsel's deficient performance caused harm." *P.W.*, 403 S.W.3d at 475 (citing *In re M.S.*, 115 S.W.3d at 545).

Under the first prong of the *Strickland* inquiry, "we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic." *Id.* (internal quotation marks omitted). Under the second prong of the *Strickland* inquiry, we review the record to determine whether counsel's deficient performance harmed the defendant. *Id.* (citing *In re M.S.*, 115 S.W.3d at 549–50). "A defendant is harmed when 'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *Id.* (quoting *In re M.S.*, 115 S.W.3d at 550). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome of the proceeding." *Id.* (quoting *In re V.V.*, 349 S.W.3d 548, 559 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

**B.     Analysis**

**1.     *Cronic* does not apply.**

M.A.B. complains that his trial counsel's performance was so deficient that we should presume harm under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984).  M.A.B. argues that this is appropriate because his trial counsel failed to comply with the duties imposed upon appointed attorneys in parental-rights termination cases by section 107.0131 of the Family Code.  *See* TEX. FAM. CODE ANN. § 107.0131 (West 2014) ("Powers and Duties of Attorney ad Litem for Parent").  The Department responds that M.A.B. failed to meet either the first or second prong of *Strickland* and that *Cronic* should not apply because even if M.A.B.'s trial counsel's performance was not error-free, the evidence shows that trial counsel did make efforts on his behalf.

We have previously recognized that "for *Cronic* to apply, counsel's failure to test the prosecution's case 'must be complete.'"  *P.W.*, 403 S.W.3d at 477 (first quoting *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 1851 (2002); and then citing *Cannon v. State*, 252 S.W.3d 342, 350 (Tex. Crim. App. 2008) (applying *Cronic* where defense counsel "entirely failed" to test State's case)).  "This is because 'bad lawyering, regardless of how bad, does not support the [*Cronic*] presumption; more is required.'"  *P.W.*, 403 S.W.3d at 477 (quoting *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990) (emphasis in original)); *see also In re*

*V.V.*, 349 S.W.3d at 560 (refusing to apply *Cronic* in case where counsel had not "entirely failed" to subject Department's case to adversarial testing).

M.A.B.'s trial counsel appeared at all pre-trial hearings on M.A.B.'s behalf. At trial, M.A.B.'s counsel objected to the admission of exhibits and evidence by the Department, cross-examined the Department's caseworker and objected to questions posed the caseworker, cross-examined the witness who testified regarding M.A.B., Sr.'s drug test results, cross-examined the Child Advocates representative and objected to questions posed to the representative, called and conducted direct examination of Ross, M.A.B., and Brooks, and presented argument at the close of evidence. M.A.B.'s argument is not that his counsel entirely failed to oppose the Department throughout the termination proceeding, but rather, that counsel's failure to perform certain actions, including some that were required by section 107.0131 of the Family Code, was so unreasonable that it amounted to no representation by counsel. This is not an argument that counsel "entirely failed" to test the Department's case; rather, it is an argument that counsel's actions fell below an objective standard of reasonableness as defined, among other things, by section 107.0131 of the Family Code. Therefore, we conclude that M.A.B.'s claim of ineffectiveness falls squarely within the type of claim governed by *Strickland*, and *Cronic* does not apply. *See P.W.*, 403 S.W.3d at 478 (substance of appellant's argument challenged certain aspects of counsel's

performance and not complete failure and therefore did not support application of *Cronic* presumption); *see also* TEX. FAM. CODE ANN. § 107.0133 (West 2014) (consequence for counsel's failure to meet requirements of section 107.0131 is that counsel may be subject to discipline under Subchapter E, Chapter 81, Government Code). Accordingly, we reject M.A.B.'s contention that we should presume harm under *Cronic* and analyze M.A.B.'s claim under *Strickland*. *P.W.*, 40 S.W.3d at 478; *see also In re V.V.*, 349 S.W.3d at 560.

## 2. M.A.B. failed to meet his burden under *Strickland*.

Even if we assume that M.A.B. met his burden under the first prong of *Strickland* to show that counsel's performance was deficient, we conclude that M.A.B. failed to carry his burden on *Strickland's* second prong. *See Ex parte Martinez*, 330 S.W.3d 891, 904 (Tex. Crim. App. 2011) (court need not address first prong of *Strickland* if claim fails under second prong). M.A.B. first raised his ineffective assistance claim in a motion to abate the appeal to permit the trial court to hold an evidentiary hearing on the matter. We granted that motion and directed the trial court to hold a hearing and make findings of fact and conclusions of law regarding M.A.B.'s ineffective assistance claim.

At the abatement hearing, M.A.B. argued that his trial counsel was ineffective because

- She did not communicate with him before trial, and her failure to communicate:

- Prevented him from designating alternative caregivers as placement options for his child;

- Resulted in him missing the first day of trial;

- Meant that she was unaware that it was impossible for him to complete the CHANGES program, and as a result she failed to request a modification to the family service plan omitting the requirement that he complete the CHANGES program;

• She did not inform him that he could elect a jury trial, and he would have elected a jury trial if he had known it was an option; and

• She incorrectly advised Brooks and Ross about their eligibility for placement and did not object to testimony regarding placement with Ross at the March 2015 hearing.

M.A.B. testified that he did not learn that he had an appointed lawyer until a year after his child was removed by the Department. He testified that they only spoke for about 30 minutes on the day of trial, and that if he had spoken with her sooner, he could have "come up with some other people that could have maybe possibly gotten my son." M.A.B. testified that he would have liked an unidentified "friend of the family" without Department or criminal history to be considered for placement. He also testified that counsel did not tell him that he had the right to a jury trial, and that he would have chosen a jury if he had known he had a choice.

M.A.B. also testified that the CHANGES program was not available to him in his unit. This testimony conflicts with his testimony at trial, where he testified that he had started the CHANGES program, but that it was "difficult" to complete

the CHANGES program in the unit to which he was currently assigned. M.A.B. testified that if he had known he had an appointed lawyer in the months leading up to trial, he would have told her that it was not feasible to complete.

Several family members also testified at the hearing. Ross and Brooks each testified at the abatement hearing that M.A.B.'s trial counsel told them they were not eligible for placement. M.A.B. also proffered evidence regarding Ross's financial situation. M.A.B., Sr. testified that he did not know that M.A.B. had a lawyer and that she did not do anything to help him figure out what he needed to do to get placement of his grandson.

M.A.B.'s trial counsel testified at the abatement hearing. Her testimony conflicted with that of M.A.B and his family. She testified that before trial, she communicated with M.A.B. through his family. She also testified that on the day of trial, she spent the entire morning with M.A.B. talking about the case. She testified that she interviewed all of M.A.B.'s family members who appeared at the various pre-trial hearings, that she advocated for the nine relatives that the Department considered for placement, and that she called Brooks and Ross at trial because they were each requesting placement. She testified that she did not tell Ross that she could not be considered for placement. She also testified that she adduced evidence from M.A.B., Sr. at trial that his positive drug test was likely the

result exposure at his job and not due to his lifestyle, but that the child was not ultimately placed with M.A.B., Sr. because he failed to complete required services.

With respect to M.A.B.'s presence at trial, trial counsel testified that she requested a continuance of the trial date so that M.A.B. could be present and that the trial was reset. She testified that trial concluded in February 2015 and that the March 2015 hearing was merely for the purpose of rendition and for the court's final decision regarding placement of the child, and therefore M.A.B.'s presence was not required. She testified that she did not specifically recall whether she discussed the availability of a jury trial with M.A.B., but that they did discuss trial strategy and that the question of whether the trial should be to the bench or to a jury is an important thing to discuss with a client. When asked why she did not ask for a modification of the family service plan, she testified that the requirements of the plan were "minimal." She testified that she did not think the requirements of the plan were too onerous because M.A.B. was only asked to complete the CHANGES program, and the program was available to him. She testified that when she spoke with M.A.B. he did not tell her that the program was not available to him and instead told her that he had begun the program but had not completed it because it was "difficult" to do so.

The trial court is the sole judge of the credibility of the witnesses at a hearing to consider a claim of ineffective assistance, and the trial court is within its

right to disbelieve any of the assertions upon which the appellant's claims of ineffective assistance are based so long as the basis for that disbelief is supported by at least one reasonable view of the record. *See Odelugo v. State*, 443 S.W.3d 131, 137 (Tex. Crim. App. 2014). Here, the trial court was not required to believe M.A.B.'s testimony at the abatement hearing that it was impossible for him to complete the CHANGES program, particularly in light of his previous admission that he had begun the program but later found it difficult to complete. The trial court alone must resolve any conflicts in the evidence and is the sole arbiter of the credibility of the witnesses, and we defer to the trial court's findings in this regard. *See In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006) (factfinder is sole arbiter of credibility of witnesses and appellate court cannot substitute own judgment); *In re G.C.*, No. 01-12-00935-CV, 2013 WL 816440, at *7 (Tex. App.—Houston [1st Dist.] March 5, 2013, pet. denied) (mem. op.) (trial court may credit testimony of one witness and discredit testimony of other).

M.A.B. contends on appeal that he could have presented favorable evidence regarding the *Holley* best interest factors at trial if trial counsel had not been ineffective. In particular, he argues that effective counsel could have helped him achieve placement of his child with Ross or some other person designated by M.A.B. With respect to Ross, the record reflects that the trial court did consider her and ultimately concluded that a different placement was in the best interest of

the child, and also concluded that the evidence adduced at the abatement hearing would not have altered that decision. To the extent that M.A.B. and Ross's testimony regarding placement conflicted with his trial counsel's, these conflicts were within the purview of the trial court to resolve.[3] *See In re H.R.M.*, 209 S.W.3d at 108–09; *In re G.C.*, 2013 WL 816440, at *7.

With respect to other placements, M.A.B. testified at the abatement hearing that he would have liked a "friend of the family" to be considered for placement. However, M.A.B. presented no evidence regarding the identity of that person, whether that person was a qualified and appropriate caregiver, or whether that person had actually agreed to assume M.A.B.'s parental responsibilities. In order to meet his burden to show that the result of the termination proceeding would have been different, M.A.B. could not state merely that he would have introduced evidence that could have changed the outcome of the proceeding—he was required to actually adduce that evidence. *See, e.g.*, *Walker v. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 625 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (where appellant claims ineffective assistance prevented introduction of favorable evidence, appellant bears burden to adduce unproduced favorable evidence in order to show outcome of proceeding would have been different).

---

[3] We note also that the child's placement is a separate issue from the determination regarding whether M.A.B.'s parental rights should have been terminated.

With respect to M.A.B.'s presence at the first day of trial, the record reflects that his trial counsel requested a continuance so that he could be present at trial and that trial was reset after a few lines of testimony were elicited from the Department's caseworker stating that the child was currently in foster care and the Department's goal in the case was unrelated adoption. There was no evidence adduced regarding M.A.B. until the February 2015 reset trial date, and M.A.B. does not argue that the minimal testimony presented by the caseworker was in any way objectionable. Thus, M.A.B. did not show that the outcome of the termination proceeding would have been different save for trial counsel's behavior with respect to this issue.

M.A.B. also testified at the abatement hearing that he would have elected a jury trial, and not a bench trial, if he had known that he had the option of a jury trial. He argues that trial counsel was ineffective because she did not inform him of his right to a jury trial. His trial counsel testified that she could not specifically recall discussing a bench trial versus a jury trial with M.A.B., but that she did specifically recall that they discussed trial strategy, that he did not request a jury trial, and that she believes that discussing whether a client wants a bench or jury trial is important. Thus, the trial court could have discredited M.A.B.'s testimony that he did not know that he could elect a jury trial and would have elected a jury if

he had known. *See In re H.R.M.*, 209 S.W.3d at 108–09; *In re G.C.*, 2013 WL 816440, at *7.

Moreover, on appeal, M.A.B. does not argue that a jury trial probably would have had a different result than a bench trial. At the abatement hearing, M.A.B. presented nothing "beyond the mere assertion that he would have chosen a jury trial, that the result of the trial would have been different" had he elected a jury trial. *See Nelloms v. State*, 63 S.W.3d 887, 892 (Tex. App.—Fort Worth 2001, pet. ref'd) (analyzing prejudice with respect to waiver of right to jury trial before disclosure of impeachment evidence). Accordingly, even if the trial court found M.A.B.'s testimony that he would have elected a jury credible, M.A.B. did not argue or show that there was a reasonable probability that the result of the termination proceeding would have been different if tried to a jury. *See id.*; *see also In re M.S.*, 115 S.W.3d at 550 (to meet second prong, appellant must show reasonable probability that result of proceeding would have been different).

The trial court found that nothing trial counsel could have done "could have changed the result in this case" and concluded that M.A.B. "did not establish that deficient performance by his appointed trial attorney prejudiced his defense in this case" and that "[t]here was nothing [M.A.B.'s] trial counsel could have done . . .

which would have changed the outcome of the case."[4] M.A.B. challenges the trial court's findings and conclusions as unsupported by the evidence, but a reasonable view of the record supports these findings and we defer to the trial court's express and implied credibility determinations and resolution of the conflicts in the evidence.[5] *See In re H.R.M.*, 209 S.W.3d at 108–09; *In re G.C.*, 2013 WL 816440, at \*7; *see also Odelugo*, 443 S.W.3d at 137.

M.A.B. did not identify or adduce any evidence trial counsel could have introduced at trial that would have altered the outcome of the termination proceeding and the record supports the trial court's finding that M.A.B. did not show that the outcome of the proceeding would have been different but for counsel's performance. Accordingly, we conclude that M.A.B. has not met his burden under *Strickland's* second prong. *See P.W.*, 403 S.W.3d at 478 (parent failed to meet burden under *Strickland's* second prong when they did not identify favorable evidence that could have been admitted but was not).

We overrule M.A.B.'s first and second issues.

---

[4] Although these last two findings appear in the trial court's conclusions of law, they are fact findings, and we treat them as such because such a designation is not controlling on appeal. *See Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979).

[5] M.A.B. conceded at the abatement hearing that "[t]here is evidence that would support a finding on . . . [subsection] Q," and the trial court entered such a finding. M.A.B. now argues in his second issue that the evidence was insufficient to support a finding under subsection Q and attacks many of the trial court's findings and conclusions on that basis. Regardless, we have determined that the record supports the trial court's findings and conclusions that we rely upon here.

## Conclusion

We affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.